UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**RITA BROGAN**,             Case Number 3:12 CV 2185

    Plaintiff,             Judge James G. Carr

    v.             REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.             Magistrate Judge James R. Knepp II

## INTRODUCTION

Plaintiff Rita Brogan filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny supplemental security income (SSI) and disability insurance benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 1383(c)(3) and 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated August 27, 2012). For the reasons stated below, the undersigned recommends remanding the Commissioner's decision.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on April 28, 2008, alleging a disability onset date of November 2, 2006, due to back pain and affective disorders. (Tr. 78-79, 150-51). Her claims were denied initially (Tr. 82-88) and on reconsideration (Tr. 91-96). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 97). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 25, 42). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481.

On August 27, 2012, Plaintiff filed the instant case. (Doc. 1).

Prior to the instant case, Plaintiff filed DIB and SSI applications on June 18, 2003, and alleged a disability onset date of August 1, 2002, due to back pain and affective disorders. (Tr. 62). On December 8, 2006, an ALJ found Plaintiff was not disabled and could perform a restricted range of light work. (Tr. 66). This prior ALJ decision (Tr. 62-74) is relevant because the ALJ in the instant case followed the *Drummond* ruling, which is a Sixth Circuit *res judicata* rule requiring an ALJ to adopt the RFC finding in a prior decision absent a change of circumstance shown by new or material evidence. *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997); *see also* Acquiescence Ruling 98-4(6).

## FACTUAL BACKGROUND

Plaintiff challenges only the ALJ's conclusions regarding her alleged mental impairment (*see* Doc. 15, at 3), and therefore waives any claims about the determinations of her physical impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Accordingly, the Court addresses only the record evidence pertaining to Plaintiff's alleged mental impairment.

Personal and Vocational History

Plaintiff was 42 years old at the time of the ALJ's decision (Tr. 36, 165) and defined as a "younger person" under the regulations. (Tr. 36, 265); 20 C.F.R. §§ 404.1563, 416.963. Plaintiff completed twelfth grade and had past work experience as a fast food worker, waitress, and commercial cleaner. (Tr. 55, 176). At the hearing, Plaintiff said she could not work because of nervousness, anxiety, and difficulties dealing with people. (Tr. 51). Plaintiff also said medication helped her mental condition (Tr. 54). Concerning daily activity, Plaintiff cleaned, cooked, watched

television, went to church a few times per week, spent time with a girlfriend, and grocery shopped. (Tr. 51-52). Plaintiff claimed she had been sober for three years and had not abused drugs for seven years. (Tr. 52).

Medical Evidence from the Previously Adjudicated Period

Plaintiff went to Fulton County Health Center (Fulton) between March 20, 2003 and April 15, 2005 for mental health treatment. (Tr. 252-57, 261-65). Plaintiff sought treatment "because she fe[lt] she was having a 'nervous breakdown'". (Tr. 252). 34 years old at the time, Plaintiff reported she had been on and off depression medication for eight years, and in and out of rehab for alcohol and drugs since she was 26 years old. (Tr. 252). Plaintiff had four young children, ages three months, three years, five years, and nine years. (Tr. 252). Her sister obtained custody of her nine year old daughter when she was an infant, and Plaintiff said she rarely saw her. (Tr. 252). Plaintiff said she drank one beer a month ago and the last time she took drugs was five years before. (Tr. 252). However, later in the interview she admitted to "popping pills left and right" over the last few weeks. (Tr. 253). She was diagnosed with major depression, recurrent; substance abuse; and assigned a global assessment of functioning (GAF) score of 25.[1] She was referred to a partial hospitalization program. (Tr. 253).

On May 24, 2004, Plaintiff returned to Fulton and complained she was extremely overwhelmed, depressed, and felt suicidal. (Tr. 255). Notes indicated Plaintiff had "very severe legal

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 21–30 reflects behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends). *DSM-IV-TR*, at 34.

problems with multiple arrests for drug trafficking, misdemeanor, robbery, and theft." (Tr. 255). She also had three children "who [were] in the custody of Children's Services for neglect as well as endangerment to a point of felony." (Tr. 255). Plaintiff reported she had been feeling extremely depressed since her children were taken away. (Tr. 255). She was on probation and had a court date scheduled the next day. She denied alcohol or drug use; however, she appeared groggy and tested positive for benzodiazepines. (Tr. 256). She was diagnosed with history of major depression and given Wellbutrin. (Tr. 256).

A year later, on April 14, 2005, Plaintiff presented to Fulton with suicidal ideation. (Tr. 261). She was residing at Serenity Haven pursuant to a court-ordered drug and alcohol treatment plan. (Tr. 261). She reported suicidal thoughts, explaining she was stressed out because her counselor told her she was not doing well with her treatment plan. (Tr. 261). Plaintiff had a long history of alcohol abuse, and notes indicated she drank a case of beer a day as well as large amounts of hard liquor. (Tr. 261). She reported she had a long history of using marijuana on a daily basis. (Tr. 261). Plaintiff was admitted to the inpatient unit for mental health treatment. (Tr. 263).

Medical Evidence from Current Period

Plaintiff saw Robert Karp, M.D., for medication management on February 6, 2007 and April 2, 2007. (Tr. 468-69, 465-66). During her February appointment, Dr. Karp discussed Plaintiff's noncompliance with laboratory testing, which Plaintiff said she could not afford. (Tr. 468). He discussed tapering and discontinuing her medication because the labs were necessary to monitor her safety. (Tr. 468). On examination, Plaintiff appeared mildly to moderately dysphoric and depressed. (Tr. 468). Dr. Karp diagnosed bipolar disorder and polysubstance dependence and prescribed a reduced amount of Lithium. (Tr. 469). Plaintiff's April 2, 2007 appointment revealed unchanged

symptoms, except she appeared in no apparent distress, her mood was mildly depressed, and she denied any thoughts of self harm. (Tr. 466).

On June 21, 2007, Plaintiff was voluntarily admitted to Defiance Regional Medical Center for feeling distraught, exhibiting pressured speech and scattered thoughts, and experiencing suicidal ideation with a plan. (Tr. 512). Plaintiff indicated her problems stemmed from not having money and not being able to see her children. (Tr. 512-13). She said she had been using marijuana frequently because she was not able to get her medication. (Tr. 513). Upon discharge, Dr. Singh noted Plaintiff's symptoms were in total abeyance and she seemed to be doing much better. (Tr. 512). He prescribed medication and instructed her to follow-up at Maumee Valley Guidance Center. (Tr. 512).

On July 2, 2007, Plaintiff saw Vinod Bhandari, M.D., at Maumee Valley Guidance Center for follow-up care. (Tr. 463-64). Plaintiff reported Seroquel helped but Lithuim was most effective in controlling her mood and depression. (Tr. 463). She was diagnosed with bipolar disorder in partial remission, polysubstance dependence, and borderline personality traits. (Tr. 463). Dr. Bhandari noted Lithium had been most useful but Plaintiff needed the proper blood tests for a prescription. (Tr. 463).

In February 2008, Plaintiff began treatment with Usha Salvi, M.D., a psychiatrist associated with Unison Behavioral Health Center. (Tr. 320-22). Plaintiff told Dr. Salvi she had been sober for 10 years but smoked marijuana six months prior. (Tr. 320). She reported receiving mental health treatment on an off for years and wanted to continue treatment at Unison. (Tr. 320). Plaintiff was prescribed medication and scheduled for a psychiatric evaluation. (Tr. 321-22).

On March 17, 2008, Dr. Savli performed a full psychiatric evaluation. (Tr. 323-27). Plaintiff

stated she had been experiencing symptoms of depression for the last ten years, which began when her daughter was taken away from her for the first time. (Tr. 323). Dr. Salvi noted Plaintiff's chief complaint was she "need[ed] to continue [her] meds" and she was "trying to get SSI". (Tr. 323). She said she had two sons, did well for while, and worked on and off until three years ago when she was charged with child neglect and her children were taken away. (Tr. 323). She stated her biggest stressor is that she cannot see her children. (Tr. 323). She reported she was homeless and had constant negative thoughts. (Tr. 323). She was staying at Sparrow's Nest but wanted to transfer out because "she was trying to follow the rules, but it [did] not seem to be working for her." (Tr. 235). Initially, she was tearful and sobbing, but euthymic with a calmer affect later on. (Tr. 325). She reported her mood was "okay". (Tr. 325). Plaintiff admitted she had been in and out of jail for trafficking drugs and felonious assault and was released from prison one month ago. (Tr. 324). She denied hallucinations, paranoia, or manic symptoms. (Tr. 324). Her hygiene and dress were appropriate and she had good, but intermittent eye contact. (Tr. 325). Her thought process was very well organized and goal-directed. (Tr. 325). A cognitive examination revealed Plaintiff was alert and oriented to place, person, and time; her general knowledge seemed quite adequate; her intelligence appeared average; immediate, recent, and remote memory were intact; she was able to recall 3/3 objects immediately; her concentration was fair; she displayed abstract thinking abilities; and her insight and judgment seemed fair. (Tr. 326). Dr. Salvi diagnosed Plaintiff with dysthymic disorder; major depressive disorder, recurrent, severe, without psychotic features; anxiety disorder, not otherwise specified; marijuana abuse, in early remission; and a GAF score of 55.[2] (Tr. 326). Dr.

---

2. A GAF between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks); or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR*, at 34.

Salvi adjusted Plaintiff's medications and recommended continued counseling and AA to maintain sobriety. (Tr. 326).

Plaintiff followed-up with Dr. Salvi on April 25, 2008. (Tr. 318). She reported she was doing a lot better on her medication and she was involved in several programs, including AA, domestic violence classes, and Hope for Family. (Tr. 318). She was feeling better and not crying as much, but her depression had increased to the point she felt suicidal. (Tr. 318). Plaintiff thought this had something to do with her menstrual cycle. (Tr. 318). Dr. Salvi noted Plaintiff was more pleasant and less agitated. (Tr. 318).

On April 26, 2008, Dr. Salvi completed a Mental Functional Capacity Assessment. (Tr. 307-08). Dr. Salvi found Plaintiff was not significantly limited in her abilities to understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without interruption; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; get along with co-workers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. (Tr. 307). He found she had moderate limitations in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 307). Dr. Salvi specifically noted Plaintiff's grooming was appropriate, her thought process was well organized, her intelligence appeared to be average, her general knowledge was adequate, and her concentration, abstract thinking, insight, and judgment appeared to be fair. (Tr. 308). Dr. Salvi expected these limitations to last nine to eleven months. (Tr. 307).

Plaintiff was hospitalized at Flower Hospital between May 21, 2008 and May 27, 2008 for

suicidal ideation, mood swings, and anxiety. (Tr. 272-301). Plaintiff's sister was interviewed during Plaintiff's hospital stay and reported Plaintiff no longer had custody of her four children, had been caught shoplifting, and was arrested and put in jail. (Tr. 289). Plaintiff's children were living with her relatives but they did not allow Plaintiff to see her children. (Tr. 289).

Upon admission, Plaintiff said she became depressed the month prior when relatives refused to let her see her children. (Tr. 293). She claimed she was having mood swings but denied psychotic systems. (Tr. 293). Dr. Cao noted Plaintiff was cooperative and her affect was appropriate but sad. (Tr. 293). Her speech and rhythm were normal, her thought process goal-directed, she denied hallucinations or delusions, she was alert and oriented, her memory was intact, and she denied homicidal ideation. (Tr. 293). She did have suicidal ideation with a plan. (Tr. 293). Dr. Cao diagnosed bipolar disorder and a GAF score of 30.[3] (Tr. 293-94). Upon discharge, Dr. Cao found Plaintiff's mood was better, she denied any suicidal or homicidal ideation, and there was no evidence of psychosis. (Tr. 272). Plaintiff was discharged with instruction to follow-up with Dr. Salvi. (Tr. 273).

On June 3, 2008, Plaintiff saw Dr. Salvi and reported she had been "'PMSing' and became suicidal." (Tr. 313). She requested to be transferred to the Woodruff Clinic under the care of Dr. Gill. (Tr. 313). Again, she reported her menstrual cycle sparked suicidal thoughts and caused her to go to the hospital. (Tr. 313). Plaintiff said she was better after Dr. Cao changed her medications. (Tr. 313). She told Dr. Salvi she was staying with a friend where there was no stress, and no rules or regulations. (Tr. 313). She said she had been sober for nine months and was in a drug and substance abuse program. (Tr. 313-14). Dr. Salvi noted Plaintiff planned to treat with Dr. Gill in the

---

2. *See*, *supra*, footnote 1.

future. (Tr. 315).

On July 21, 2008, state agency psychologist Caroline Lewin, Ph.D. completed a Mental Residual Capacity Assessment. (Tr. 376-80). Dr. Lewin adopted the mental RFC from the prior ALJ's decision dated December 8, 2006 under the *Drummond* Ruling because she found there was no new or material change in Plaintiff's condition. (Tr. 378); *See* AR 98-4(6), 1998 WL 283902, at *3 ("SSA may not make a different finding in adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim unless new and additional evidence or changed circumstances provide a basis for a different finding of the claimant's residual functional capacity."). State agency professional Karen Terry, Ph.D. affirmed Dr. Lewin's opinion on January 9, 2009. (Tr. 446).

Plaintiff began seeing Dr. Satwant Gill on August 14, 2008. (Tr. 414). She requested the transfer of care because Dr. Gill was closer to where she lived. (Tr. 414). Plaintiff told Dr. Gill she had a history of depression and mood swings. (Tr. 414). She also said she used to drink and use marijuana, and "for several reasons" her children were taken away from her. (Tr. 414). Plaintiff reported she was doing better than before she went to the hospital in May 2008 and was sleeping fairly well, but she still experienced crying spells and felt moody and irritated at times. (Tr. 415). Plaintiff claimed she had been clean for over a year with no consumption of drugs or alcohol. (Tr. 415). She was trying to do better so she could get her children back. (Tr. 415). Plaintiff denied auditory or visual hallucinations, paranoid, homicidal, or suicidal ideations. (Tr. 415).

On examination, Plaintiff was alert and oriented, dressed neatly, cooperative, and her speech was soft and non-pressured. (Tr. 416). Some lability of mood was noted, and she seemed anxious and irritated initially, but relaxed as the appointment progressed. (Tr. 416). No overt delusional

thinking was noted, she was in no acute distress, and she did not appear to be an immediate danger to herself or others.

Plaintiff followed-up with Dr. Gill on October 23, 2008. (Tr. 412). She reported her medication helped her mood and sleep pattern. (Tr. 412). She said her boyfriend passed away, which caused her to feel emotional, but she had been feeling better. (Tr. 412). She denied current use of alcohol, marijuana, or any illicit substances. (Tr. 412). She also denied suicidal or homicidal ideations. (Tr. 412). On examination, her mood and affect were stable, no lability of mood was noted, no thought disorder noted, she was not in any immediate danger to herself, and she wanted to continue her current medications. (Tr. 412).

Plaintiff continued treatment with Dr. Gill between January 8, 2009 through May 28, 2010. (Tr. 477-82, 486-87, 491-92, 495-98, 500-02, 504-06). On each occasion, Plaintiff denied manic symptoms, auditory or visual hallucinations, alcohol or drug use, and suicidal or homicidal ideation. (Tr. 477, 479, 481, 486, 491, 495, 497, 500, 504). She was always alert, oriented and cooperative (Tr. 477, 479, 481, 486, 491, 495, 497, 500, 504), and her mood was generally stable (Tr. 477, 479, 481, 486, 491, 495, 497). During her first few visits, Plaintiff told Dr. Gill she was having crying spells; however, at the same time, Plaintiff denied suicidal ideation, and she was alert, oriented and cooperative. (Tr. 500, 504). After those initial visits, Plaintiff's mood was stable. (Tr. 477, 479, 481, 486, 491, 495, 497). And by 2009 and 2010, Plaintiff denied depression (Tr. 477, 479, 481) and mood swings (Tr. 477, 479, 481, 486), and said her medication was helping (Tr. 477-78, 479, 481, 486, 491, 495, 497).

On July 23, 2010, Dr. Gill completed a form titled "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment." (Tr. 510-11). Dr. Gill checked boxes

10

indicating Plaintiff had less than moderate limitations[4] in her ability to remember, understand, and follow simple directions, and interact appropriately with others. He found Plaintiff had moderate limitations in her ability to maintain attention and concentration for two-hour periods of time, perform work activities at a reasonable pace, keep a regular work schedule and maintain punctual attendance, withstand the pressures of routine simple unskilled work, and make judgments that commensurate with the functions of unskilled work. (Tyr. 510-11). Moderate limitations was defined as: "An impairment which seriously interferes with, and in combination with one or more other restrictions assessed, may preclude the individual's ability to perform the designated activity on a regular and sustained basis." (Tr. 510).

VE Testimony

The VE described some of Plaintiff's past work experience as unskilled and light in exertional level (fast-food worker, waitress) and some as unskilled and medium in exertional level (commercial cleaner).

The ALJ asked the VE to consider a hypothetical individual limited to light work that would perform best in a work environment without closely regimented pace or production or close supervisory scrutiny. (Tr. 56). The VE testified such a person with those limitations and Plaintiff' vocational profile would be able to perform Plaintiff's prior work as a waitress.

The ALJ then asked the VE whether such a person would be able to work with all the limitations set forth in Dr. Gill's report (Tr. 510-11). Given those limitations, the VE testified the individual could not work. (Tr. 57).

---

4. This form did not provide a block to indicate whether an individual had no limitations in a given area, and was not an SSA form.

ALJ's Decision

On September 3, 2010, the ALJ found Plaintiff had the severe impairments of degenerative disc disease and depressive disorder but the impairments did not meet or medically equal a listed impairment. (Tr. 30). The ALJ discussed Plaintiff's mental history but found her treating sources, Drs. Gill and Salvi, provided statements which reflected Plaintiff was capable of engaging in work-related activities. (Tr. 33-34). The ALJ then adopted the finding of the previous ALJ because there was no evidence of improvement in Plaintiff's condition, nor was there new or additional evidence or changed circumstances. (Tr. 35).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) &

416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred in applying *Drummond* because there was new and additional evidence in the form of Dr. Gill's opinion, two psychiatric hospital admissions, and outpatient therapy. (Doc, 15, at 8). In addition, Plaintiff argues the ALJ failed to follow the treating physician rule concerning Dr. Gill's assessment. (Doc 15, at 10). For the following reasons, the undersigned recommends remanding for further analysis of treating physician Dr. Gill's opinion.

**Treating Physician Rule**

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability –

the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544. An ALJ"s reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F. 3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Good reasons are required even when the conclusion of the ALJ may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows her physician has deemed her disabled and might be bewildered when told by an ALJ she is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id*.

During the hearing, the ALJ specifically mentioned Dr. Gill's evaluation to the VE, read the form's definitions of moderate and marked, and recited Dr. Gill's individual responses in each category of functioning – the same form the ALJ later used in his decision to support the conclusion that Plaintiff could engage in work-related activity. The VE testified a person restricted by the limitations in Dr. Gill's assessment could not work. (*See* Tr. 56-57). And while the RFC determination is the ALJ's province, not the VE's, when the ALJ read Dr. Gill's restrictions to the

15

VE, it appears the ALJ asked the VE to modify the hypothetical to include those restrictions. When he did so, the VE stated such an individual would not be employable. Nevertheless, in his written decision the ALJ concluded Dr. Gill's opinion showed Plaintiff could engage in work-related activities. (Tr. 33-34). The undersigned believes this inconsistency must be resolved on remand. Stated another way, the ALJ could not state he was crediting Dr. Gill's assessment, present that assessment to the VE as a list of further limitations upon the hypothetical, and disregard without explanation the VE's testimony that the hypothetical individual with those limitations would be unemployable.

Despite the VE's testimony that a verbatim recitation of a portion of Dr. Gill's evaluation would render such an individual unemployable, the ALJ found Dr. Gill's opinion showed Plaintiff was capable of engaging in work-related activity. (Tr. 34). Perhaps the VE did not appreciate the definitions associated with the terms used in the evaluation, or perhaps the ALJ rejected the notion that the various moderate restrictions Dr. Gill noted deprived Plaintiff of the RFC to work. As it presently stands, however, this Court cannot conclude substantial evidence supports the determination that she had such capacity.

While the ALJ did discuss Dr. Gill's treatment notes – which plausibly did not support the conclusion that Plaintiff was unemployable – the ALJ's reference to the same was not explained as the Sixth Circuit requires. That is, it was not "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544. First, the ALJ must assign some semblance of weight to Dr. Gill's opinion. Here, while the ALJ noted Dr. Gill's assessment showed Plaintiff could work, he failed to reconcile contrary VE testimony based on a verbatim recitation of an excerpt of Dr.

16

Gill's evaluation. Second, the ALJ must provide good reasons for diverting from a treating physician opinion. Here, the VE testified Plaintiff could not perform light work when given Dr. Gill's restrictions. This testimony directly conflicts with the ALJ's subsequent finding that Dr. Gill's restrictions supported a finding that Plaintiff could engage in work-related activities. Dr. Gill's restrictions, coupled with his treatment notes, may not merit controlling weight, but the ALJ must assign weight to his opinion and provide good reasons for discounting it, to the extent it conflicts with his RFC. Otherwise, it would seem the ALJ must explain why he did not credit the VE's testimony about those opinions.

**RFC Finding and *Drummond* Analysis**

Prior decisions of the Commissioner which were not appealed are binding on a claimant and the Commissioner. *Drummond,* 126 F.3d at 841. In *Drummond*, the Sixth Circuit held the Commissioner is bound by its prior findings with regard to a claimant's RFC unless new evidence or changed circumstances require a different finding. *Id.* SSA Ruling 98-4(6) therefore mandates:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3.

It is Plaintiff's burden to show circumstances have changed since the prior ALJ's decision "by presenting new and material evidence of deterioration." *Drogowski v. Comm'r of Soc. Sec.*, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011) *report and recommendation adopted*, 2011 WL 4502955 (E.D. Mich. Sept. 28, 2011).

If Dr. Gill's report is credited fully, and if the VE's testimony that an individual restricted in that manner survives reexamination on remand, this could constitute new and material evidence. In the alternative, should the ALJ reconcile the RFC with the weight assigned to Dr. Gill's evaluation, it may well be that there was no new evidence showing Plaintiff's condition worsened.

It appears that before the prior determination and during the unadjudicated period, Plaintiff continually presented or was treated for suicidal ideation due to losing her children, and struggled to maintain sobriety with sporadic success. (Tr. 252-57, 261-65, 261-63, 272-301, 323-27, 466-68). However, by 2009 and 2010, treating physician Dr. Gill's notes showed Plaintiff was stable and doing well on medication. (Tr. 477, 479, 481, 486, 491, 495, 497, 500, 504). Plaintiff asserts two inpatient hospitalizations constitute new and additional evidence which render *Drummond* inapplicable. However, the undersigned find these hospitalizations merely showed Plaintiff's condition had not changed, with or without alcohol abuse, because Plaintiff sought treatment and was hospitalized for depression, just as she had during the prior period.

At its core, Plaintiff's argument is that the ALJ's reliance on Dr. Gill's opinion to find Plaintiff could work, despite VE testimony to the contrary, is inexplicable. The undersigned agrees and recommends remanding the case to reconcile this conflict. In so doing, the Court notes Dr. Gill's treatment notes largely showed Plaintiff could work. Indeed, on numerous occasions, Dr. Gill indicated Plaintiff's condition was stable, and Plaintiff denied depression and suicidal ideation. (Tr. 477, 479, 481, 486, 491, 495, 497, 500, 504). The ALJ's failure to follow the treating physician rule only renders his *Drummond* analysis improper to the extent Dr. Gill's evaluation actually alters Plaintiff's RFC, rendering her unemployable. This is what the current state of the record, specifically the VE's testimony, suggests could happen, and the contradiction must be reconciled.

**CONCLUSION AND RECOMMENDATION**

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI benefits is not supported by substantial evidence and recommends that the matter be remanded for further proceedings consistent with this opinion.

s/James R. Knepp II<br>
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).